UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MUSSARAT BANO and BASHIR RAHEE,

                    Plaintiffs,

     -against-

UNITED STATES OF AMERICA; THE CITY OF NEW
YORK; NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES COMMISSIONER JESS
DANNHAUSER, in his official capacity; NEW YORK
CITY ADMINISTRATION FOR CHILDREN'S
SERVICES CASEWORKER NICOLE RAMIREZ, in
her individual and official capacity; LITTLE FLOWER
CHILDREN AND FAMILY SERVICES CHIEF
EXECUTIVE OFFICER CORINNE HAMMONS, in her
official capacity; LITTLE FLOWER CHILDREN'S
SERVICES CASE PLANNER RENEE HARTLEY-
SAMMS, in her individual capacity,

                    Defendants.

---

**MEMORANDUM
AND ORDER**
No. 23-CV-4773

*For the Plaintiff:*
JULIA HERNANDEZ
TAREK Z. ISMAIL
CUNY School of Law
2 Court Square
Long Island City, NY 11101

*For Defendant U.S.A.:*
MARIKA M. LYONS
U.S. Attorney's Office, E.D.N.Y.
271 Cadman Plaza East
Brooklyn, New York 11201

*For the N.Y.C. Defendants:*
DARIAN ALEXANDER
New York City Law Department
100 Church Street
New York, New York 10007

*For the Little Flower Defendants:*
MICHAEL C. BECKER
Rutherford & Christie, LLP
800 Third Avenue, 9th Floor
New York, New York 10022

1

**BLOCK, Senior District Judge:**

Mussarat Bano and Bashir Rashee ("Plaintiffs") have brought this action for declaratory relief and damages against the United States of America ("U.S." or "Government"), New York City ("City"), and officials and employees from New York City Administration for Children's Services ("ACS") and Little Flower Children and Family Services ("Little Flower"). Plaintiffs' suit emanates, principally, from the alleged "seizure" of Plaintiffs' 16-year-old daughter from a shopping mall in Pakistan by the Government. and the defendants' subsequent failure to provide information or answer their questions about their child's whereabouts once she returned to the United States.

Plaintiffs' Amended Complaint advances seven claims against the defendants, in various iterations: two claims against the U.S. under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, for intentional infliction of emotional distress ("IIED") and negligence; three 42 U.S.C. § 1983 claims—for violations of procedural and substantive due process, and interference with intimate association—against the City, Dannhauser and Ramirez (the "City Defendants"), as well as Little Flower CEO Corinne Hammons and Little Flower caseworker Renee Hartley-Samms ( the "Little Flower Defendants"); a § 1983 claim for inadequate training and supervision against the City and Dannhauser; and a malicious prosecution claim against the City Defendants.

Each of the defendants has now moved to dismiss the complaint arguing, *inter alia*, that their conduct was a reasonable response to the child's serious allegations of parental abuse. Initially, the U.S. has moved to dismiss the FTCA claims pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of jurisdiction and, alternatively, under 12(b)(6) for failure to state a substantive claim. The City Defendants and Little Flower Defendants have moved pursuant to 12(b)(6) to dismiss all of Plaintiffs' claims against them.

## I.    Legal Standards

In reviewing a 12(b)(1) motion to dismiss, the Court must "draw all inferences in favor of Plaintiffs, [who] must prove by a preponderance of the evidence that subject matter jurisdiction exists." *Nouritajer v. Jaddou*, 18 F.4th 85, 88 (2d Cir. 2021). The court must accept as true all non-conclusory factual allegations in the complaint, "unless contradicted by more specific allegations or documentary evidence." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

"[A] defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). "In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence

of factual problems' in the assertion of jurisdiction." *Id.* (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient" to establish subject-matter jurisdiction. *Id.*

Thus, in resolving disputed jurisdictional factual issues, the court may rely on evidence presented outside the pleadings, such as affidavits. *See Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."). The Court may also take judicial notice of relevant documents. *See Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1992).

The Government has supplied the Declaration of Kristina Beard, ECF No. 60-2, and multiple accompanying documents in support of its 12(b)(1) motion.[1] These documents are chiefly government records and email correspondence. They

---

[1] The Beard Declaration and accompanying exhibits were submitted under seal. The Court in its discretion is unsealing the select portions of those exhibits referenced here in order to fully set forth the background facts underlying this dispute. *See Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 464 F. Supp. 2d 164, 165 (E.D.N.Y. 2006) ("The decision to unseal a document filed under seal is a matter left to the district court's discretion.").

4

have the imprimatur of trustworthiness, and the Plaintiffs have raised no concern with the Court's taking them into account. *See Firestone v. Fed. Retirement Thrift Inv. Bd.*, 375 F. Supp. 3d 102, 112 (D.D.C. 2019) (noting that a "presumption of regularity attaches to ordinary-course government records" absent clear contrary evidence (citation modified)). The Court accordingly considers these documents in analyzing the Government's 12(b)(1) motion.

Different standards, however, govern the Court's analysis of the defendants' multiple Rule 12(b)(6) motions. There, the Court assumes the complaint's factual allegations, but not legal conclusions, to be true. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013). To survive, the complaint must include sufficient facts to state a claim to relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), i.e., the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, in evaluating the several Rule 12(b)(6) motions, the Court limits review of the facts to those alleged in the Amended Complaint. The Court may also take judicial notice of matters of public record, such as court documents. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a

5

district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6).").

## II.    Statement of Facts

The following facts are drawn from both the Plaintiffs' Amended Complaint, ECF No. 27, and the exhibits accompanying the Beard and Alexander Declarations, ECF Nos. 60-2, 68. The Court integrates them to set forth the most complete and coherent account of the facts at issue but will explain in its analysis and resolution of the 12(b)(1) and 12(b)(6) motions which facts are relevant in respect to each motion.

Plaintiffs Bano and Rahee have six children: five sons and one daughter, F.B.[2] Am. Compl. ¶ 26. The family emigrated from Pakistan to the U.S. when F.B. was four years old and lives in Montrose, New York. *Id.* ¶¶ 26, 27. In July 2019, the family traveled to Pakistan to visit extended family, including F.B.'s uncle and aunt. *Id.* ¶ 27; Beard Decl. Ex. A. At some point prior to June 2020, Rahee, F.B.'s father, returned to New York. Am. Compl. ¶ 27; Beard Decl. Ex. A.

On June 17, 2020, F.B. called the U.S. consulate in Lahore, Pakistan, and "state[d] her uncle and aunt have beaten her several times" and she was worried

---

[2] Plaintiffs have initialized their daughter's name pursuant to FRCP 5.2(a), which provides "the name of an individual known to be a minor" may be replaced by the minor's initials. The privacy afforded F.B. by this initialization provides further support for the Court's decision to unseal select portions of the documents attached to the Beard Declaration. *See supra* note 1.

that her family would not allow her to return to the U.S. Beard Decl. Ex. A. F.B. said she had reported the matter to the local police, but they would not intervene because it was a "family matter." *Id.* She explained that she was concerned about a possible forced marriage and asked for help to return to the U.S. She was afraid that her family would "make her disappear" if she stayed in Pakistan. *Id.*

That day, Lahore consular chief Kelly Kopcial began communicating with F.B. by phone and email. Beard Decl. Ex. C. F.B. repeated her fears. She also explained that her father had taken her passport before his return to New York and that her brother "said he was canceling my ticket" because she threatened to call the police. Beard Decl. Exs. C, D. That same day, Kopcial began speaking with State Department officials about F.B.'s case and how it might be possible, if at all, to effectuate her return. Beard Decl. Ex. C.

The next day, June 18, 2020, Kopcial informed F.B. that the consulate was working to obtain the requisite permissions to issue F.B. a new passport. Beard Decl. Ex. B. Kopcial also asked F.B.'s permission to share her information with Health and Human Services ("HHS") and inquired whether her mother was inclined to permit her to return. *Id.* F.B. agreed to share her information and explained that "[n]o one is supportive of me getting home at all." *Id.* She added that her mother wanted her to stay in Pakistan permanently and had "let her brother

7

and his wife beat me up multiple times and supported and abused me with them."
*Id.*

During the following days, Kopcial and F.B. stayed in regular contact regarding the issuance of the passport and the logistics of her departure. *Id.* On June 22, 2020, Kopcial told F.B. she had received permission to issue an emergency passport, and that HHS had contacted social services in New York concerning F.B.'s case. *Id.* Arrangements were being made for a consulate staffer to meet F.B. at a local mall, where F.B. would try to slip away from her family. *Id.*

On June 23, 2020, F.B. did just that. When she and Bano were at a shopping mall that day, F.B. stepped into a store and never emerged. Am. Compl. ¶ 30. Rather than return to her mother, she met at the mall with staff from the consulate, which had arranged an airline ticket for her to travel to New York. Beard Decl. Ex. D.

Bano was terrified that F.B. had been abducted or trafficked. Am. Compl. ¶ 31. She contacted mall security and Pakistani police, who reviewed security camera footage and learned that F.B. had been escorted from the mall by an unidentified individual and driven to the U.S. consulate in Lahore. *Id.* at ¶¶ 30–31. Bano and Rahee both called the consulate and the U.S. embassy in Islamabad but received no response as to F.B.'s whereabouts or well-being until June 29, 2020,

8

nearly a week later, when they were informed by an unnamed State Department official that F.B. had left Pakistan and was safe. *Id.* at ¶¶ 32–33.

Earlier, on June 26, 2020, Kopcial had written an email to Rahee stating: "We have received your June 25 email concerning your daughter, [F.B.]. The Department's Office of Overseas Citizen Services is also aware of the case and alerted us to your recent phone call to report the issue. Due to privacy considerations, we are prohibited by law from discussing issues related to an ongoing Consular case." Beard Decl. Ex. G.

Also on June 26, 2020, F.B. had arrived at JFK Airport in New York, where officials had arranged for a case worker to meet her. Beard Decl. Exs. F, I. At that time, ACS took custody of F.B. when its caseworker Ramirez met her at the airport. Am. Compl. ¶¶ 39, 41. F.B. told Ramirez that her father was in New York. *Id.* at ¶ 41.

On June 30, 2020, Little Flower caseworker Hartley-Samms accepted assignment of F.B.'s case without verifying or confirming whether there was a court order authorizing her to take custody of F.B. *Id.* at ¶¶ 43–44. On July 6, 2020, Hartley-Samms organized a "transitional conference," attended by herself, F.B., F.B.'s assigned foster parent, and Ramirez, to discuss how to proceed. *Id.* at ¶ 45. Neither Ramirez nor Hartley-Samms notified Plaintiffs of this meeting. *Id.*

The following day, July 7, 2020, Dannhauser and Ramirez filed a "meritless" Destitute Child Petition in the New York County Family Court, which Ramirez signed under oath. *Id.* at ¶¶ 46–47. In this petition, Ramirez alleged—without investigating—that F.B.'s family was forcing her to marry against her will and that the whereabouts of F.B.'s parents was "unavailable." *Id.* at ¶¶ 49, 51. Almost three months later, on September 29, 2020, Dannhauser and Ramirez withdrew the Destitute Child Petition and replaced it with an Abuse Petition. *Id.* at ¶ 52. On that same day, the Family Court issued an order directing the temporary removal of F.B. Alexander Decl. Ex. C.

Meanwhile, F.B.'s family had been trying to obtain information about her whereabouts. On the day F.B. had arrived in the United States—June 26, 2020—a State Department official had contacted F.B.'s repatriation case manager, conveying that there had been calls from her family reporting she had been kidnapped. Beard Decl. Ex. I. The official suggested to the case manager that F.B. should contact her family in Pakistan to assure them she was okay, but the case manager reported that F.B. did not want to do that. *Id.*

On July 2, 2020, Kopcial wrote to F.B., informing her that her mother had visited the embassy, seeking information about F.B. Beard Decl. Ex. H. Kopcial asked F.B. to either send a brief message to her parents to let them know she was in the U.S. and safe, or to sign a Privacy Act waiver enabling the consulate to do so.

*Id.* F.B. insisted she did not want her parents contacted and "want[ed] them to continue thinking I'm still in Pakistan." *Id.*

It was not until July 20, 2020—eighteen days later—when Plaintiffs learned from the New York State police that F.B. had arrived at JFK in late June and was in the custody of a child protective services agency; neither federal nor state officials would confirm which agency had custody. Am. Compl. ¶ 35. On July 24, 2020, Plaintiffs learned that F.B. was in the legal and physical custody of ACS, and that Hartley-Samms had accepted F.B.'s case. *Id.* at ¶¶ 36, 43.

On February 14, 2022, the Family Court dismissed the City Defendants' Abuse Petition without making any findings concerning the alleged maltreatment or abuse. *Id.* at ¶ 53. F.B. then was reunited with her family. *Id.* at ¶ 5. In 2023 she left to study in London. *Id.*

### III.    The Government's Motions to Dismiss

#### *A.  Jurisdictional Issues*

Although the U.S. may ordinarily be liable for IIED and negligence tort claims under the FTCA, the Government argues in its 12(b)(1) motion that several exceptions to this waiver of sovereign immunity apply—most significantly, that the Government conduct at issue occurred in a foreign country. *See Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 121 (2d Cir. 2021) ("The FTCA contains several exceptions, which preserve the Government's sovereign immunity

under specified circumstances." (citing 28 U.S.C. § 2680)). Plaintiffs bear the initial burden of showing that their claims fall within the FTCA's limited waiver of immunity and are not barred by an exception under the statute. See *Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021).

The U.S. argues that there are three reasons that it is immune to suit on Plaintiffs' FTCA tort claims, notwithstanding the FTCA's waiver: (1) the foreign country exception to the FTCA, which applies to claims arising in other countries; (2) the discretionary function exception, which applies to certain discretionary acts of government employees; and (3) the private analog requirement, which precludes claims against the U.S. for which there is no comparable private tort.

### 1.  Foreign Country Exception Defined

The foreign country exception, is set forth in the text of the FTCA, which restores the U.S.'s sovereign immunity for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k).

The Government argues that this exception bars Plaintiffs' claims because the conduct of which Plaintiffs complain—removing F.B. from their custody and transporting her back to the U.S. without any notification or warning—all occurred in Pakistan.

Plaintiffs agree that the foreign country exception bars them from recovering for any injuries suffered in Pakistan[3] but argue that they nonetheless have a cognizable claim against the Government because they suffered additional injuries in the United States when the Government continued to deprive them of their daughter's custody by failing to inform them of her whereabouts.

This case, therefore, raises the question of whether a plaintiff can assert a cognizable FTCA claim for additional injuries that occurred after the initial injuries suffered in a foreign country by reason of the Government's subsequent tortious conduct in the United States. Based upon the Court's research, no reported case has addressed this precise question.

The beginning point in the Court's analysis is the seminal Supreme Court case of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). There the plaintiff, a Mexican national, was abducted from Mexico to stand trial in the United States for the torture and murder of a DEA agent in Mexico. He was subsequently acquitted and sued the United States under the FTCA. In refusing to dismiss the case, the Ninth Circuit relied on what had become known as the "headquarters doctrine," precluding the application of the foreign country exception for claims which

---

[3] The exception also encompasses claims based on torts that occur at U.S. embassies and on property located in a foreign country. *See Smith v. United States*, 507 U.S. 197, 203–04 (1993) (FTCA waiver inapplicable to torts occurring at U.S. facility in Antarctica); *Galvin v. United States*, 859 F.3d 71, 73 (D.C. Cir. 2017) (diplomatic housing); *Asmah v. U.S. Consulate Accra Ghana*, No. 15-CV-3742, 2016 WL 2993203, at *4 (S.D.N.Y. May 23, 2016) (embassy).

"typically involve allegations of negligent guidance in an office within the United States of employees who cause damage while in a foreign country, or activities which take place in a foreign country." *Id.* at 701 (citation modified). Its reasoning was that since the plaintiff's abduction in Mexico "was the direct result of wrongful acts of planning and direction by DEA agents located in California, his abduction 'fits the headquarters doctrine like a glove.'" *Id.* at 702 (citation modified).

In reversing, the Supreme Court principally reasoned that "[w]hen the FTCA was passed, the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti*: courts generally applied the law of the place where the injury occurred." *Id.* at 705. "For a plaintiff injured in a foreign country, then, the presumptive choice in American courts under the traditional rule would have been to apply foreign law to determine the tortfeasor's liability." *Id.*

The Court concluded that "[t]he application of foreign substantive law . . . was, however, what Congress intended to avoid by the foreign country exception." *Id.* It bolstered its conclusion by drawing from the statute's legislative history:

> The object being to avoid application of substantive foreign law, Congress evidently used the modifier 'arising in a foreign country' to refer to claims based on foreign harm or injury, the fact that would trigger application of foreign law to determine liability. That object, addressed by the quoted phrase, would obviously have been thwarted, however, by applying the headquarters doctrine, for that doctrine would have displaced the exception by recasting claims of foreign injury as claims not arising in a foreign country because some

14

planning or negligence at domestic headquarters was their cause. And that, in turn, would have resulted in applying foreign law of the place of injury, in accordance with the choice-of-law rule of the headquarters jurisdiction.

*Id.* at 706.

The Court held, therefore, "that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act of omission occurred." *Id.* at 712. The Ninth Circuit faithfully subsequently followed *Sosa. See S.H. by Holt v. United States*, 853 F.3d 1056, 1058 (9th Cir. 2017) (holding that for purposes of the FTCA's foreign country exception "an injury is suffered where the harm first impinges upon the body, even if it is later diagnosed elsewhere" (citation modified)).

## 2. Post-*Sosa* Decisions

None of the post-*Sosa* cases address the precise issue now confronting the Court. Since *Sosa* the Second Circuit has only twice opined on the foreign country exception, both times in non-precedential summary orders. *See Rodriguez v. U.S. Army*, 788 F. App'x 67 (2d Cir. 2019) (summary order); *Leytman v. United States*, 832 F. App'x 720 (2d Cir. 2020) (summary order). In *Rodriguez*, the Circuit tersely affirmed a district court order that had dismissed FTCA claims arising from a murder committed by a U.S. servicemember in Panama, finding the foreign country exception squarely applied. *See* 788 F. App'x at 68. In *Leytman*, a pro se plaintiff alleged that security officials had subjected him to heightened screening at

15

the Moscow airport prior to boarding a flight to New York. The Circuit found these allegations likewise to be unambiguously encompassed by the exception, noting that in light of *Sosa*'s repudiation of the "headquarters doctrine" this would be true even if orders for the enhanced screening in Moscow had originated in the U.S. *See* 832 F. App'x at 722.

There are a handful of decisions by Second Circuit district courts applying the exception post-*Sosa. See Roe v. United States*, No. 18-CV-2644, 2019 WL 1227940 (S.D.N.Y. Mar. 15, 2019); *Asmah v. U.S. Consulate Accra Ghana*, No. 15-CV-3742, 2016 WL 2993203 (S.D.N.Y. May 23, 2016); *In re Agent Orange Prod. Liability Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005). None involved a comparable scenario. *Roe* concerned a plaintiff's removal *from* the United States to a foreign country, and the district court found the exception inapplicable because the "last act necessary to establish liability" occurred in the U.S. 2019 WL 1227940, at *5 (citing *Sosa*, 542 U.S. at 75). *Asmah* held that the exception applied to alleged torts occurring at the U.S. embassy in Ghana, *see* 2016 WL 2993203, at *4, while the sprawling *Agent Orange* case concerned a unique scenario involving tort claims against the manufacturers of Agent Orange and herbicides used in the Vietnam war.

The decisions of other circuit courts are also inapt. Perhaps, arguably, the most relevant are those where a few appellate courts have articulated a "derivative injury" doctrine. *See Harbury v. Hayden*, 522 F.3d 413, 423 (D.C. Cir. 2008);

16

*Gross v. United States*, 771 F.3d 10, 13 (D.C. Cir. 2014) (affirming dismissal of alleged economic injuries of American contractor detained and imprisoned in Cuba as derivative of foreign injuries); *S.H. by Holt v. United States*, 853 F.3d 1056, 1063 (9th Cir. 2017) (finding cerebral palsy injury diagnosed in the U.S. to be derivative of premature birth and permanent injury suffered in Spain); *see also Klayman v. Obama*, 125 F. Supp. 3d 67, 85–86 (D.D.C. 2015) (applying derivative injury doctrine to claims of IIED alleged by relatives of individuals killed in Israel).

Thus, in *Harbury*, the D.C. Circuit found the exception applicable to claims brought by the widow of a Guatemalan rebel who sued U.S. officials for negligence and infliction of emotional distress she suffered in the United States arising from the torture and killing of her husband in Guatemala. But those injuries were clearly derivative because they were based "entirely on the injuries her husband suffered [in Guatemala]." 522 F.3d at 423. The court explained that "[a] plaintiff in Harbury's situation cannot plead around the FTCA's foreign-country exception simply by claiming injuries such as 'emotional distress' that are derivative of the foreign-country injuries at the root of the complaint." *Id.* To permit such claims under the FTCA "would threaten to 'swallow the foreign country exception whole.'" *Id.* (quoting *Sosa*, 542 U.S. at 703).

17

There are also some appellate decisions reiterating *Sosa*'s focus on the location of the injury in other factual contexts. *See, e.g.*, *Hernandez v. U.S.*, 757 F.3d 249, 258 (5th Cir. 2014).[4] In *Hernandez*, the Fifth Circuit was confronted with claims brought by the family of a man allegedly shot while standing in Mexico by a border patrol agent standing in the U.S. The court reasoned that because the victim was undisputedly standing in Mexico at the time he was shot, "[a]ny claim will therefore necessarily be based on an injury suffered in a foreign country." *Id.* The Ninth Circuit analyzed a still more improbable scenario in *Quintero Perez v. United States*, finding the exception inapplicable in the case of a man who was standing on the border fence when he was shot and killed by a border agent, his body landing halfway across the border. 8 F.4th 1095. Because the fence on which he was standing when shot was built within U.S. boundaries, "the injury took place in the United States, so the foreign country exception d[id] not apply." *Id.* at 1101 n.1.

Numerous other appellate decisions provide limited aid, as they are largely confined to analyzing the applicability of the exception to various types of facilities. *See Galvin v. United States*, 859 F.3d 71, 74 (D.C. Cir. 2017) (holding

---

[4] The full Fifth Circuit affirmed after a rehearing en banc. *See Hernandez v. United States*, 785 F.3d 117 (5th Cir. 2015). The Supreme Court then vacated on other grounds, holding that the Fifth Circuit had erred in granting qualified immunity because the nationality of the victim was unknown to the border patrol agent at the time of the shooting. *See Hernandez v. Mesa*, 582 U.S. 548, 554 (2017).

that foreign country exception applies to claim of faulty construction in diplomatic housing abroad); *Doe v. Meron*, 929 F.3d 153, 167 (4th Cir. 2019) (affirming exception applies to U.S. military bases abroad). Others simply echo holdings found in the Second Circuit cases. *See, e.g. Arce v. United States*, 899 F.3d 796, 801 n.5 (9th Cir. 2018) (noting à la the S.D.N.Y. decision in *Roe* that FTCA claims concerning plaintiff's deportation *from* the U.S. are not covered by the exception).

### 3. Foreign Country Exception Applied

How then should the present case be resolved, where the Plaintiffs plead that they suffered additional emotional injuries in the United States by reason of the torts committed by the U.S. in New York because of the Government's alleged negligence in failing to timely advise the Plaintiffs of their daughter's safety and whereabouts in the United States?

Plainly this is not a headquarters case, which would entail planning in the United States *before* the injuries occurred. Nor is the "derivative injuries" preclusion concept a relevant fit because Plaintiffs' injuries were not simply derived from the Government's foreign behavior; rather they were newly created by the Government's separate alleged tortious conduct in the United States.

In the Court's view, the conceptual basis for resolving the question is bottomed in the underlying rationale for Congress' enactment of the foreign country exception as explained in *Sosa*, namely the need to avoid having to apply

foreign law. That is plainly not an issue here since the alleged tortious behavior which caused the additional emotional injuries occurred in the United States. Therefore, the foreign country exception will not bar the Court from accepting jurisdiction over Plaintiffs' FTCA suit.

Nor will the other bases for the Government's immunity claim.

### 4. Discretionary Function Exception

The Government makes a second immunity argument because of the "discretionary function" exception ("DFE"). This exception applies to claims based on the acts of a Government employee "exercising due care, in the execution of a statute or regulation . . . or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty[.]" 28 U.S.C. § 2680(a). "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Additionally, "the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537).

Thus, the exception bars FTCA suits if two conditions are met: "(1) the acts alleged to be [tortious] must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the

judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *Berkovtiz* and *Gaubert*).

The Government contends that its actions in helping F.B. leave Pakistan and declining to provide timely information of her whereabouts to her parents are encompassed by the DFE. It argues that they were discretionary decisions, rooted in policy considerations and that consular assistance to minors implicates multiple statutes and regulations which authorize officials to use their judgment. *See, e.g.*, 22 C.F.R. § 51.28(b)(1) (providing that minors who are age 16 and older may execute their own passport applications "unless, in the judgment of the person before whom the application is executed, it is not advisable").

However, the DFE does not apply because the Plaintiffs have plausibly alleged that the Government's actions contravened due process. *See Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally[.]"). In analyzing the DFE, "[t]he Second Circuit and its district courts have consistently held that a federal officer does not have the discretion to commit constitutional violations." *M.Q. v. United States*, No. 22-CV-10680, 2025 WL 965810, at *6 (S.D.N.Y. Mar. 31, 2025); *see also D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 591 (S.D.N.Y. 2022) ("Other circuits are in accord [with the

Second Circuit], holding that the DFE does not shield unconstitutional conduct.");
*Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) ("We hold that the
FTCA's discretionary-function exception does not provide a blanket immunity
against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional
prescription.").[5]

Plaintiffs contend that both their procedural and substantive due process
rights were violated. To be sure, they have a "constitutionally protected liberty
interest in the care, custody and management of their children." *Tenenbaum v.
Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

In respect to procedural due process, "[a]s a general rule, before parents may
be deprived of the care, custody or management of their children without their
consent, due process—ordinarily a court proceeding resulting in an order
permitting removal—must be accorded to them." *Id.* (citing *Stanley v. Illinois*, 405
U.S. 645, 649 (1972)). The Government may, however, act without notice or
authorization in limited emergency circumstances. *Id.* at 595. In "emergency
circumstances," officials may take a child into custody without ordinary procedural

---

[5] Other circuits have taken a differing view that this amounts to "circumvent[ing] the limitations
on constitutional tort actions . . . by recasting the same allegations [] as a common-law tort claim
under the FTCA that is not subject to the discretionary function exception[.]" *Shivers v. United
States*, 1 F.4th 924, 921 (11th Cir. 2021); *see also Linder v. United States*, 937 F.2d 1087, 1090
(7th Cir. 2019) ("[T]he theme that 'no one has discretion to violate the Constitution' has nothing
to do with the [FTCA], which does not apply to constitutional violations."). The circuit split is
briefly summarized in *Mynatt v. United States*, 45 F.4th 889, 897 n.4 (6th Cir. 2022).

safeguards, unless there is "reasonable time safely to obtain judicial authorization consistent with the child's safety." *Id.* at 596. "Emergency circumstances mean circumstances in which the child is immediately threatened with harm." *E.D. ex rel. Demtchenko v. Tuffarelli*, 408 F. App'x 448, 450 (2d Cir. 2011) (summary order) (citing *Tenenebaum*, 193 F.3d at 593).

In respect to substantive due process, the Government once again cannot interfere with a parent's constitutionally protected liberty interest. But this interference "must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012).

Initially, the Court cannot fault the Government for its actions in effecting the removal of F.B. from Pakistan. To the contrary, it applauds its sensible and rational behavior in erring on the side of caution in secretly extricating F.B. from that country. It was the classic example of an emergency. To have given the Plaintiffs notice of its actions would have been foolish and counterproductive, and certainly its behavior was not shocking, arbitrary and egregious.

But the Government's keeping the whereabout of the Plaintiffs' child a secret once she was safely in the United States does raise at least a serious procedural due process issue. Surely, the Government could have notified the

Plaintiffs of their daughter's whereabouts and that she was safe once she was out of harm's way.

Because the DFE does not shield such unconstitutional conduct, the Government is not jurisdictionally immune from suit on that basis.

### 5.  Private Analog

The FTCA also provides that claims brought pursuant to the statute must have a private analog. *See* 28 U.S.C. § 1346(b)(1) (providing for jurisdiction of claims "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); *C.P. Chem. Co. v. United States*, 810 F.2d 34, 37 (2d Cir. 1987) ("The plain meaning of section 1346(b) is that the United States cannot be held liable when there is no comparable cause of action against a private citizen.").

The Government asserts that there is no private analog for Plaintiffs' conduct, characterizing the Government's actions as "determining U.S. citizenship; issuing a U.S. passport; assessing a minor U.S. citizen's claims of abuse and forced marriage to determine what assistance is warranted under applicable treaties, statutes, and regulations; determining what information could be shared with third parties under the Privacy Act; and providing repatriation assistance." Def.'s Mem. at 20, ECF No. 59-1. That conduct would not have a private analog. But this mischaracterizes the Plaintiffs' allegations of wrongdoing. As explained, *supra*, in

24

addressing the Government's 12(b)(1) motion, the Plaintiffs' allegations focus on the interference with custody and withholding of information.

In other FTCA cases, courts have found that "a private individual could be held liable for separating a parent from a child, barring the two from communicating, and doing so in a way to cause maximum distress." *D.J.C.V.*, 605 F. Supp. at 601; *see also, e.g.*, *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020) (denying motion to dismiss in separation case after finding "[p]rivate individuals have been held liable for IIED, negligence, and loss of child's consortium in Arizona under reasonably similar circumstances"); *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 18 (E.D.N.Y. 1978) ("The unlawful taking or withholding of a minor child from the custody of the parent entitled to such custody is a tort."). The Government's actions here are at least "comparable" to a private cause of action. *See Chen v. United States*, 864 F.2d 622, 626 (2d Cir. 1988) ("[F]or liability to arise under the FTCA, a plaintiff's cause of action must be 'comparable' to a cause of action against a private citizen[.]'" (quoting *C.P. Chem*, 810 F.3d at 37)).

Thus, the Government is not immune from suit for lack of a private analog.

### B.  12(b)(6) Motion to Dismiss

In addition to the jurisdictional challenge, the Government has alternatively moved to dismiss the Amended Complaint for failure to state a claim. Once again, on a Rule 12(b)(6) motion, the Court assumes the complaint's factual allegations,

but not legal conclusions, to be true. In contrast to its analysis of the Government's

12(b)(1) motion, the Court does not consider the facts supplied outside the

complaint other than for relevant matters of which it may take judicial notice. *See*

*Pani*, 152 F.3d at 75.

Plaintiffs have alleged claims for both IIED and negligence.

### 1. Intentional Infliction of Emotional Distress

"Under New York law,[6] a claim for intentional infliction of emotional distress

requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or

reckless disregard of a substantial probability of causing, severe emotional distress;

(3) a causal connection between the conduct and the injury; and (4) severe

emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 824 (2d Cir. 1999) (citing

*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)).

There can be no question that there is "a causal connection between the

[Government's] conduct" in the United States "and the injury" since the sustained

disappearance of a child is likely to cause severe emotional distress. *See D.J.C.V.*,

605 F. Supp. 3d at 601 (claims of separation "easily clear the bars set by the IIED

and NIED torts"); *A.P.F.*, 492 F. Supp. 3d at 999 (same); *see also, e.g.*, *Santiago-*

---

[6] In resolving FTCA claims, "courts are bound to apply the law of the state where the [tort] occurred," i.e., New York law. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021) (citation modified).

*Ramirez v. Sec'y of Dep't of Def.*, 984 F.2d 16, 20 (1st Cir. 1993) (citing *Sheehan v. United States*, 896 F.2d 1168 (9th Cir. 1990)) ("Claims against the government for intentional infliction of emotional distress are not excepted from the FTCA."); *Gross v. United States*, 676 F.2d 295, 304 (8th Cir. 1982) (rejecting argument that plaintiff may not bring claim of IIED against federal government).

### 2. Negligence

"Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2000) (citing *Merino v. N.Y.C. Transit Auth.*, 218 A.D.2d 451, 639 (N.Y. App. Div. 1996)).

Plaintiffs have alleged that the Government had a duty to act with "ordinary care and prudence" that it breached by not timely informing them about F.B.'s wellbeing in the United States. *See* Am. Compl. ¶ 114. A reasonable juror could conclude that withholding that information for a sustained period breached that duty in a manner that could foreseeably cause emotional injury. *See, e.g. D.J.C.V.*, 605 F. Supp. 3d at 601–02 (finding plaintiffs stated a claim for negligence under New York law where they "alleged that Government agents violated their duty to act with ordinary care towards them by separating parent and child and preventing them from communicating").

27

The Government argues, however, that Plaintiffs' negligence claim fails because under New York law the government can only be liable for negligent performance of a government function where there is a "special duty" between the plaintiff and government. Defs.' Opp. at 24 (citing *McLean v. City of N.Y.*, 12 N.Y.3d 194, 199 (2009)).

However, the "special duty" requirement "is not based upon state tort law, but rather, sovereign immunity." *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 383 (E.D.N.Y. 2009) (citing *Cossano v. New York*, 129 A.D.2d 671, 672 (2d Dep't 1987)). The federal government has by statute in the FTCA articulated specific circumstances in which its own immunity is waived. "Hence, this [special-duty] requirement does not apply to claims under the FTCA, which directs the court to consider private-party liability under state tort law." *Id.*

In sum, Plaintiffs have adequately pled claims of IIED and negligence in the United States against the Government.

## IV.   The City Defendants' Motion to Dismiss

Unlike the Government, the City Defendants do not question the Court's jurisdiction but move to dismiss each of Plaintiffs' claims pursuant to Rule 12(b)(6). Accordingly, the Court limits its review to the facts alleged in the Amended Complaint, and those relevant documents of which it may permissibly take judicial notice.

Plaintiffs have alleged five causes of action against the three City Defendants—the City, Dannhauser, and Ramirez—each arising under § 1983: substantive due process; procedural due process; interference with intimate association; malicious prosecution; and inadequate training and supervision. Because Dannhauser is named as a defendant in his official capacity as ACS commissioner, the Court construes the claims against him as claims against ACS. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself."). Thus, the Court analyzes these claims in tandem with the claims against the City before separately analyzing the claims against Ramirez.

## A. Claims Against the City & ACS

A municipal entity can be liable under § 1983 provided there is an official policy or custom that caused a plaintiff to be deprived of a constitutional right. *See Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Specifically, *Monell* provides that a municipality "may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision . . . [but] may not be held liable for the actions of its employees or agents under a theory of

29

*respondeat superior*; it is liable only when its policy or custom inflicts the injury upon the plaintiff." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell*, 436 U.S. at 690–91, 694).

To state a claim for municipal liability under § 1983, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Id*. A municipality's "failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

The Court must accordingly dismiss the Plaintiffs' first four causes of action against the City and ACS because they fail to allege violations of any "governmental custom, policy, ordinance, regulation, or decision." *Batista*, 702 F.2d at 397. Only Plaintiffs' fifth cause of action—alleging inadequate training and supervision on the part of the City and ACS—alleges a policy or custom.

The City and ACS argue that the complaint does not allege the requisite deliberate indifference or any policy or custom beyond conclusory statements that lack "factual enhancement." ECF No. 66-1 at 33. They are correct that it does not identify a specific training that was not provided to City employees. However, this

30

is not fatal. "It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 129 n.10 (2d Cir. 2004).

The complaint identifies numerous subjects which could serve as the basis for a finding that the City's training and supervision was "grossly inadequate," including repatriation cases, methods for investigation of abuse allegations, and notice-and-hearing requirements. *See* Am. Compl. ¶¶ 102–04. This is circumstantial evidence which, taken collectively with Plaintiffs' allegations of the Government officials' behavior and their alleged deprivation of Plaintiffs' constitutional rights, suffice to satisfy Plaintiffs' statement of failure to train and supervise claims. *See Davis v. City of New York*, No. 16-CV-3685, 2017 WL 11505252, at *10–11 (E.D.N.Y. May 25, 2017) (finding circumstantial indication of failure to train sufficient to withstand 12(b)(6) motion).

### B. *Claims Against Ramirez*

Plaintiffs claim that they have viable individual § 1983 claims against Ramirez for violations of their rights to substantive due process, intimate association, procedural due process, and freedom from malicious prosecutions.[7] As

---

[7] During oral argument Plaintiffs withdrew their malicious prosecution claim.

an employee of a municipality, Ramirez is deemed to have been acting under "color of law" under §1983 and may therefore be individually sued under that statute for federal constitutional and statutory violations. *See Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is fairly attributable to the State can be sued as a state actor under § 1983." (citation modified)).

The allegations against Ramirez are based on her alleged conduct in the United States. She was the case worker who took custody of F.B. as soon as F.B. landed in the United States on June 26; participated in the filing of a Destitute Child Petition ten days later, on July 7, 2020, which she signed under oath in the New York County Family Court, and swore in that petition—without conducting an investigation—that F.B.'s family was forcing her to marry against her will and that the whereabouts of her family was "unavailable." *See* Am. Compl. ¶¶ 46–51. The Destitute Child Petition was extant for three months, when Ramirez then filed the Abuse Petition resulting in the Family Court's temporary removal order.

This conduct clearly alleges a due process violation. And it also satisfies the heightened standard for a cognizable substantive due process claim because the totality of Ramirez' conduct, if true, was "shocking, arbitrary**,** and egregious." *Southerland,* 680 F.3d at 162.[8] Although Plaintiffs' substantive due process claim

---

[8] The Court rejects the City Defendants' argument that its alleged actions do not constitute a "removal" and thus cannot support a substantive due process violation. *See* ECF No. 66-1 at 25.

survives, their intimate association claim must be dismissed because it is duplicative of the substantive due process claim. *See Richardson-Holness v. Alexander*, 196 F. Supp. 3d 364, 374 (E.D.N.Y. 2016) ("[T]o the extent the intimate associational rights plaintiff asserts arise under the Due Process Clause, and not the First Amendment, as seems to be the case, the appropriate course is to dismiss the intimate association claim as duplicative.").

At oral argument Ramirez's counsel took issue with Plaintiffs' due process allegations in several respects, but at this pleading stage the Court must accept the allegations as true.

Nonetheless, Ramirez contends that she is entitled to qualified immunity. "ACS caseworkers and their superiors are generally entitled to qualified immunity from claims under §1983 if it was objectively reasonable for the caseworkers to believe their conduct did not violate clearly established statutory or constitutional rights of which a reasonable caseworker would have known." *V.S. v. Muhammad*, 595 F.3d 426, 430–31 (2d Cir. 2010).

Certainly Ramirez should have known that Plaintiffs had a clearly established constitutional right to the care and custody of their child. And a reasonable juror could certainly find that her overall conduct was not objectively

---

However, physical removal of a child by the state is not required to state a due process claim. *See Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000).

reasonable. *See, e.g., Southerland*, 680 F.3d at 151 (vacating grant of qualified immunity to ACS caseworker in circumstances where "a reasonable juror could find that there was sufficient time to acquire a court order prior to removal," precluding a finding that caseworker's actions were "objectively reasonable" (citation modified)); *see also Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022) (explaining that "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch . . . [and] faces a formidable hurdle" given plaintiffs' entitlement to all reasonable inferences at the pleadings stage (citation modified)).

Accordingly, Plaintiffs have alleged both procedural and substantive due process § 1983 claims against Ramirez, for which she is not now—if ever—entitled to qualified immunity.

## V.    Hartley-Samms's Motion to Dismiss

Plaintiffs have sued Little Flower's chief executive officer, Corinne Hammons, in her official capacity, and its case planner Hartley-Samms, in both her individual and official capacities. Unlike their claims against the City, the Plaintiffs have not sued Little Flower as an entity for *Monell* liability. Nor could they since it is not a municipality; nor are they contending that Little Flower should nonetheless

be held liable under *Monell* as a "state actor."[9] And, as previously explained, claims against employees in their official capacities are tantamount to claims against the entity. *See Graham*, 473 U.S. at 166.

Rather, although they have brought §1983 procedural and substantive due process claims and interference with intimate association claims against Little Flowers' case planner, Hartley-Samms, in her official capacity, they have also asserted these claims against her in her individual capacity. Thus, the Court must determine whether Hartley-Simms was a "state actor," which is the predicate for a § 1983 lawsuit for constitutional deprivations against an individual who is not a municipal employee. *See Filarsky*, 566 U.S. at 383.

The factual allegations against Hartley-Samms, once again, are that she was assigned by Little Flower as a case planner; that there was no court order authorizing Little Flower to take custody of F.B., that she "did not seek to verify or otherwise confirm whether a court order existed authorizing them to take custody of F.B.," and that she and Ramirez "organized and held a 'Transitional Conference.'" Moreover, they "did not attempt to notify Plaintiffs, and Plaintiffs were not notified of the conference."  *See* Am. Compl. ¶¶ 43–45.

---

[9] Counsel for the Plaintiffs confirmed at oral argument that they are not seeking to hold Little Flower liable. Previously, Plaintiffs had voluntarily dismissed their claims against Hammons. *See* ECF No. 64.

The Second Circuit has held that foster care agencies are performing a public function and are liable as state actors under § 1983. *See Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974). However, the defendant has cited a case, *C.B. v. St. Vincent's Servs., Inc.*, where a district court held that post-*Perez* Supreme Court precedent has taken a more limited view of state action and "substantially replaced the approach relied upon in *Perez*." No. 16-CV-2282, 2018 WL 1737701, at *4 (S.D.N.Y. Mar. 19, 2018). The district court in *C.B.* concluded, therefore, that foster agencies are not state actors. *Id.*

Other district courts in this circuit have likewise questioned the underlying logic of *Perez* but have nevertheless recognized that they are bound to follow this precedent and treat foster care agencies as state actors. *See, e.g.*, *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 274 (E.D.N.Y. 2011) ("assuming—as I am obligated to do until the Second Circuit holds otherwise—that SVS is a state actor"); *S.M. by next friend King v. City of New York*, 2021 WL 3173456, at *4 (S.D.N.Y. July 26, 2021) ("[Although a] number of district courts in this circuit have noted that treating foster agencies as state actors is in tension with the Supreme Court's increasing skepticism—in the almost forty years since *Perez*— toward applying constitutional demands to plausibly private action . . . the Court remains bound by the Second Circuit[.]").

36

The Court follows these district courts in finding itself bound by the Second Circuit precedent in *Perez* to treat Little Flower as a state actor. *See Diamond Jewels v. Lewis*, No. 15-CV-5760, 2019 WL 5896224, at *11 (E.D.N.Y. Nov. 12, 2019) (noting recent decisions of other district courts determining private foster care agencies are not state actors but concluding that "*Perez* . . . remains good law and is binding"). Accordingly, it follows that its employee, Hartley-Samms, is also a state actor. *See Mortimer v. City of New York*, No. 15-CV-71866, 2018 WL 1605982, at *13 (S.D.N.Y. Mar. 29, 2018) (finding two individuals foster care employees subject to liability under 1983 as state actors); *Diamond Jewels*, 2019 WL 5896224, at *11 (same).

Unlike the allegations against Ramirez, the allegations against Hartley-Samms do not rise to the heightened level of "shocking, arbitrary, and outrageous" behavior to support a substantive due process claim and the duplicative interference with intimate association claim. But they are sufficient to support a procedural due process claim against her because she allegedly was not authorized to take custody of F.B.

Nor is she entitled at this stage to qualified immunity. *See Southerland*, 680 F.3d at 151. Nonetheless, Hartley-Samms contends that she is entitled to judicial immunity, which New York courts have extended not only to judges, but to those acting pursuant to a court order. *See Mosher-Simons v. Cnty. of Allegany*, 99

N.Y.2d 214, 220 (2002). While it is conceivable that Hartley-Samms could claim

such immunity for her actions subsequent to the Family Court's order on

September 29, 2020, *see* Alexander Decl. Ex. C., there was no such order when she

assumed custody of F.B. on June 30, 2020.

## VI.    Conclusion

The Government's motion to dismiss is denied. The City Defendant's motion

to dismiss is granted *except* with respect to the procedural and substantive due

process claims against Ramirez, and the inadequate training and supervision claim

against the City and ACS. The Little Flower Defendants' motion to dismiss is

granted *except* with respect to the procedural due process claim against Hartley-

Samms.

**SO ORDERED.**

                                          _/S/ Frederic Block_____
                                          FREDERIC BLOCK
                                          Senior United States District Judge

Brooklyn, New York
June 26, 2025